**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| MICHAEL T. PYRTLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:10CV683 |
| | ) | |
| HENRY MCTHADDEN HAYES, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on the Motion for Summary Judgment on Plaintiff's Claims under Federal Law filed by Defendants Sam Page, Mark S. Martin, Gene Setliff, Kathy Wilson, and the Ohio Casualty Insurance Company ("OCIC") (Docket Entry 40) and the Motion for Summary Judgment on Plaintiff's Claim under State Law filed by Defendants Page and OCIC (Docket Entry 42). For the reasons that follow, the Court should grant these Motions.

### I. Background

The First Amended Complaint ("FAC") alleges that Plaintiff, while detained at the Rockingham County Jail (the "Jail"), suffered injuries at the hands of a fellow detainee, Defendant Henry McThadden Hayes. (Docket Entry 17, ¶¶ 15-28.) In addition to <u>individual capacity</u> claims against Defendant Hayes for assault and battery under state law (<u>id.</u>, ¶¶ 2, 46-55),[1] the FAC asserts

---

[1] The Clerk has entered a default against Defendant Hayes (Docket Entry 21) and the Docket reflects neither a subsequent
(continued...)

official capacity claims against Defendant Page (the Sheriff of Rockingham County) and Defendants Martin, Setliff, and Wilson (deputies employed by Defendant Page) (collectively, the "Sheriff Defendants") (id., ¶¶ 4-7), as follows:

1) a "First Claim for Relief" against the Sheriff Defendants "pursuant to 42 U.S.C. § 1983 for [v]iolation of [the] Eighth Amendment [of the United States Constitution]" for failing to protect Plaintiff from Defendant Hayes (id., ¶¶ 29-40);

2) a "Second Claim for Relief" against Defendant Page for "[n]egligence" in connection with his "duty to adequately train [his] deputies . . . to ensure that their actions d[o] not cause an unreasonable risk of harm" (id., ¶¶ 41-45); and

3) a "Fifth Claim for Relief" against Defendant Martin "pursuant to 42 U.S.C. § 1983 for violations of the Fourteenth and Eighth Amendment's [sic] of the [United States] Constitution" for "[t]he use of OC spray on Plaintiff . . . while [he] was being attacked by Defendant Hayes,"[2] in a manner constituting "unreasonable and excessive force" so as to "violat[e] [Plaintiff's] protected liberty interest and depriv[e] him of due

---

[1](...continued)
motion to set aside that default nor a motion for default judgment (see Docket Entries dated Apr. 6, 2011, to present).

[2] "'OC' is an abbreviation for 'oleoresin capsicum.' OC spray is also known as pepper spray or mace." United States v. Rodriquez, 392 F.3d 539, 542 n.1 (2d Cir. 2004). "Pepper spray is a milder irritant [than tear gas] and is employed to avoid physical confrontation among inmates and guards . . . ." Jackson v. Morgan, 19 F. App'x 97, 102 (4th Cir. 2001).

process of law," as well as to contravene the ban on "cruel and unusual punishment" (id., ¶¶ 56-62).[3]

After the filing of the instant Motions by the Sheriff Defendants and OCIC (Docket Entries 40, 42), Plaintiff responded (Docket Entries 46-49) and the Sheriff Defendants and OCIC replied (Docket Entries 50, 51).

## II. Discussion

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, the Court "may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Instead, it "must consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from the facts in the non-movant's favor." Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 266 (4th Cir. 2001).

---

[3] Although these claims make no mention of OCIC, the FAC names OCIC as a Defendant and alleges that, "[a]t all times complained of[, it] was the bonding agent for [Defendant] Page." (Docket Entry 17, ¶ 3.) Under North Carolina law, "[i]n actions against [a] sheriff, the plaintiff must ordinarily join the [sheriff's] surety as a party to the action." Clark v. Burke Cnty., 117 N.C. App. 85, 89, 450 S.E.2d 747, 749 (1994). Additionally, the FAC asserts official capacity claims against two John Doe defendants (i.e., "Deputy Doe 1 and 2") as to the First Claim for Relief. (Docket Entry 17, ¶¶ 8, 9, 17-19, 30, 31, 34, 35, 37, 39.) However, consistent with Plaintiff's deposition testimony, his summary judgment response brief effectively abandons any contention that any governmental official, other than the Sheriff Defendants, caused him harm. (See Docket Entry 48 at 1 ("During the entire time Plaintiff was in custody (prior to his assault) he only recalls interacting with three officers, Defendants Martin, Setliff and Wilson."); see also Docket Entry 46-6 at 9, 32.)

-3-

"[T]here is no burden upon 'the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact.'  Rather, 'the burden on the moving party may be discharged by "showing" – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'"  Carr v. Deeds, 453 F.3d 593, 608 (4th Cir. 2006) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)) (internal emphasis omitted).  Conversely, "[t]he party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but 'must come forward with specific facts showing that there is a genuine issue for trial.'"  Emmett v. Johnson, 532 F.3d 291, 297 (4th Cir. 2008) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)); see also Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 308 (4th Cir. 2006) ("Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law.").

## A.  First Claim for Relief -- Failure to Protect

According to the FAC's First Claim for Relief, the Sheriff Defendants "failed to take [steps to protect Plaintiff, which inaction they] knew, or in the exercise of due care should have known, [would cause Plaintiff] to suffer serious physical injuries to his person [by] Defendant Hayes."  (Docket Entry 17, ¶ 30.)  Although (as detailed in Section I) the FAC cites the Eighth Amendment as the predicate for this claim, "[a]s a pretrial

-4-

detainee, [Plaintiff's] treatment and the conditions of his restraint are evaluated under the Due Process Clause of the Fourteenth Amendment." Robles v. Prince George's Cnty., Md., 302 F.3d 262, 269 (4th Cir. 2002); accord Bell v. Wolfish, 441 U.S. 520, 535 n.16 (1979) ("The Court of Appeals properly relied on the Due Process Clause rather than the Eighth Amendment in considering the claims of pretrial detainees."). For pertinent purposes, however, the Eighth and Fourteenth Amendments provide the same guarantee, i.e., "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 199-200 (1989) (emphasis added). In other words, "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs — e.g., food, clothing, shelter, medical care, and reasonable safety — it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." Id. at 200 (emphasis added).

"It is not, however, every injury suffered by one prisoner [or detainee] at the hands of another that translates into constitutional liability for prison [or jail] officials responsible for the victim's safety." Farmer v. Brennan, 511 U.S. 825, 834 (1994). Indeed, the United States Supreme Court expressly has "held that the Due Process Clause of the Fourteenth Amendment is

-5-

not implicated by the lack of due care of an official causing unintended injury to life, liberty or property." <u>Davidson v. Cannon</u>, 474 U.S. 344, 347 (1986). Plaintiff thus cannot maintain a claim against the Sheriff Defendants based on evidence merely sufficient to support a finding that they "negligently failed to protect him from another inmate . . . [because] lack of care simply does not approach the sort of abusive governmental conduct that the Due Process Clause was designed to prevent." <u>Id.</u> at 347-48 (internal quotation marks omitted).

Instead, this standard applies:

> <u>First</u>, a constitutional violation occurs only where the deprivation alleged is "objectively, sufficiently serious." For a claim based on a failure to prevent harm, a [plaintiff] must show that he [was] detained or incarcerated "under conditions posing a <u>substantial risk of serious harm</u>." . . . <u>Second</u>, an official must have "a sufficiently culpable state of mind." In prison[/jail]-conditions cases, the requisite state of mind is "<u>deliberate indifference</u>."

<u>Brown v. Harris</u>, 240 F.3d 383, 388-89 (4th Cir. 2001) (quoting <u>Farmer</u>, 511 U.S. at 834) (internal citations and secondary internal quotation marks omitted) (emphasis added).[4]

Further, because (as documented in Section I) Plaintiff has lodged this claim only against the Sheriff Defendants in their

---

[4] As the United States Court of Appeals for the Fourth Circuit has observed, <u>Farmer</u> "addressed only the duties of 'prison officials' under the Eighth Amendment. <u>Farmer</u>, however, merely defined the term 'deliberate indifference,' a standard previously employed by the Supreme Court in <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976), and its progeny. <u>See Farmer</u>, 511 U.S. at 829. <u>Farmer</u> in no way undermined [the Fourth Circuit's prior] holding . . . that the same 'deliberate indifference' standard applies to both inmates and pretrial detainees. Indeed, other circuits have imported the <u>Farmer</u> framework into cases involving pretrial detainees." <u>Brown</u>, 240 F.3d at 388 n.6 (internal parallel citations omitted).

official capacities, i.e., against the local governmental entity of the Office of Sheriff of Rockingham County, "it must be shown that the actions of [the Sheriff Defendants] were unconstitutional <u>and were taken pursuant to a custom or policy of the entity</u>." <u>Giancola v. State of W. Va. Dep't of Pub. Safety</u>, 830 F.2d 547, 550 (4th Cir. 1987) (emphasis added) (citing <u>Monell v. New York City Dep't of Soc. Servs.</u>, 436 U.S. 658, 690–92 (1978)); <u>accord</u> <u>Board of Cnty. Comm'rs of Bryan Cnty., Okla.</u>, 520 U.S. 397, 403 (1997) ("[L]ocal governmental bodies . . . may not be held liable under § 1983 solely because [they] employ[] a tortfeasor. . . . Instead, in <u>Monell</u> and subsequent cases, [the Supreme Court] ha[s] required a plaintiff seeking to impose liability on a [local governmental body] under § 1983 to identify a [local governmental] 'policy' or 'custom' that caused the plaintiff's injury."). Accordingly, Plaintiff must show that a "constitutional injury [wa]s proximately caused by a written policy or ordinance, or by a widespread practice that is 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" <u>McFadyen v. Duke Univ.</u>, 786 F. Supp. 2d 887, 954 (M.D.N.C. 2011) (quoting <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 127 (1988)).

In moving for summary judgment on Plaintiff's First Claim for Relief, the Sheriff Defendants do not appear to contend that the record lacks evidence which (if taken in the light most favorable to Plaintiff) would permit a reasonable fact-finder to determine that (as a function of his confinement in a locked cell with Defendant Hayes over-night) Plaintiff was "detained . . . 'under

-7-

conditions posing a substantial risk of serious harm,'" <u>Brown</u>, 240 F.3d at 389 (quoting <u>Farmer</u>, 511 U.S. at 834). (<u>See</u> Docket Entry 41 at 9-13.)[5]  Instead, as to Plaintiff's constitutional failure-to-protect claim, the Sheriff Defendants have focused on the Supreme Court's definition of deliberate indifference in this context, specifically the requirement that an official "knows of and disregards an excessive risk to inmate [or detainee] health and safety; [i.e., to culpably disregard such a risk] the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference," <u>Farmer</u>, 511 U.S. at 837. (<u>See</u> Docket Entry 41 at 10 ("Plaintiff cannot show that any of the [Sheriff Defendants] were both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and that the [Sheriff Defendants] also drew the inference.").)

_____

[5] This choice may stem from the fact that:  1) the <u>Farmer</u> Court stated that identifying "[a]t what point a risk of inmate assault becomes sufficiently substantial . . . [wa]s a question th[at] case d[id] not present, and [that it would] not address," <u>Farmer</u>, 511 U.S. at 834 n.3; and 2) no subsequent cases (at least from the Supreme Court or Fourth Circuit) seemingly have clarified the issue, <u>see generally</u> <u>Brown v. Budz</u>, 398 F.3d 904, 911 (7th Cir. 2005) ("Due to a relative dearth of case law on point, it has for some time been unclear at what point a risk of inmate assault becomes sufficiently substantial for purposes of a failure to protect claim." (internal brackets and quotation marks omitted)). One court in this Circuit has placed the "substantial risk of serious assault" somewhere above "a baseline risk of assault inherent in prison [or jail] life," <u>Bond v. Story</u>, No. 3:09CV147, 2011 WL 5599390, at *3 (E.D. Va. Nov. 17, 2011) (unpublished), such as where "it is highly probable that a particular attack will occur, or in instances where a particular detainee poses a heightened risk of assault to the plaintiff," <u>Bond v. Story</u>, No. 3:09CV147, 2010 WL 2943081, at *3 (E.D. Va. July 20, 2010) (unpublished) (internal brackets and quotation marks omitted).

Plaintiff's summary judgment response brief identifies two points during his detention at which record evidence purportedly would permit a reasonable fact-finder to conclude that one or more of the Sheriff Defendants disregarded a substantial risk that Defendant Hayes would assault Plaintiff despite both knowing facts that objectively established such a risk and subjectively inferring the existence of such a risk: i) before locking Plaintiff in a cell for the night with Defendant Hayes (see Docket Entry 48 at 8-9, 12-14); and ii) after Defendant Hayes first attacked Plaintiff in that locked cell during the night (see id. at 9-11, 14-17).

### i. Deliberate Indifference before Lights-out

In his summary judgment response brief, Plaintiff focuses on two circumstances preceding his confinement in a cell for the night with Defendant Hayes that supposedly support a failure-to-protect claim: a) evidence that Defendant Hayes assaulted another detainee before he assaulted Plaintiff; and b) evidence that the Jail did not segregate detainees based on the nature of their pending charge and/or prior arrest history. (See Docket Entry 48 at 8-9, 12-14.) For reasons set out below, Plaintiff's arguments in this regard lack merit and the Court should enter summary judgment in the Sheriff Defendants' favor on the portion of the First Claim for Relief that alleges deliberate indifference as to Plaintiff's over-night placement in a locked cell with Defendant Hayes.

### a. Prior Assault

Plaintiff asserts that the record contains evidence showing that, before he was confined for the night with Defendant Hayes

-9-

(and two other detainees), "[Defendants] Martin, Setliff, and Wilson <u>knew</u> of [a prior] assault by [Defendant] Hayes <u>or should have known</u> of this assault since one of them removed the victim from the cell." (<u>Id.</u> at 8 (emphasis added) (citing "Pyrtle Dep. p. 132").)[6]  To the extent Plaintiff relies on a "should have known" theory in this regard, he cannot satisfy the deliberate indifference standard because <u>Farmer</u> expressly adopted a subjective recklessness test for deliberate indifference that requires <u>actual knowledge</u> of facts establishing a substantial risk of serious harm, <u>see</u> <u>Farmer</u>, 511 U.S. at 835-40, over alternatives that permitted a finding of deliberate indifference when an official "'should have known of a sufficiently serious danger to an inmate,'" <u>id.</u> at 832 (quoting <u>Young v. Quinlan</u>, 960 F.2d 351, 360-61 (3d Cir. 1992)), or had "constructive notice," <u>id.</u> at 841.  <u>See, e.g.</u>, <u>Case v. Ahitow</u>, 301 F.3d 605, 605 (7th Cir. 2002) (citing <u>Farmer</u> in observing that "deliberate indifference to the plaintiff's safety[] mean[s] that [prison officials] knew of a serious danger to him (really knew-not

_____

[6] According to Plaintiff's deposition testimony, that earlier assault occurred "sometime after supper" ("[p]robably 40 minutes" before "lights-out") on the evening preceding Defendant Hayes's night-time assault on Plaintiff. (Docket Entry 46-6 at 14-15.)  He further testified that the cell doors had been opened to allow detainees to use a telephone and that, "just about the time . . . [the detainees] knew that their time out of their cell[s] was dwindling down," a group of "[p]robably 10 or more" crowded into the cell occupied by Plaintiff, Defendant Hayes, and two others, for the apparent purpose of collectively smoking two cigarettes. (<u>Id.</u>)  Plaintiff's testimony reflects that, during these events, Defendant Hayes "grabbed [a member of the group] around the throat from behind.  And another couple of guys had snatched his socks off, and they were trying to find a cigarette that he had . . . .  After they got the gentleman's socks off, . . . [Defendant] Hayes turned him loose.  And that was pretty much it."  (<u>Id.</u>)

just should have known, which would be all that would be required in a negligence case)"); <u>Larry v. South Cent. Reg'l Jail</u>, No. 2:10CV1241, 2011 WL 7394618, at *10 (S.D.W. Va. Dec. 27, 2011) (unpublished) ("The allegation that these defendants 'should have known' that [an inmate] posed a serious risk of harm to the plaintiff or other inmates connotes negligence, not deliberate indifference, and is insufficient to state a claim herein. The plaintiff must demonstrate that these defendants had actual knowledge of a serious risk of harm . . . ."), <u>recommendation adopted</u>, 2012 WL 524443 (S.D.W. Va. Feb. 16, 2012) (unpublished).

Further, the evidence cited by Plaintiff would not permit a reasonable fact-finder to determine that Defendants Martin, Setliff, and Wilson <u>knew</u> Defendant Hayes had committed an assault prior to his assault on Plaintiff. Specifically, (as noted above) Plaintiff's summary judgment brief identifies only this page of his deposition transcript as his proof on this point:

Page 132
```
 1  or someone specifically told you no?
 2    A. I don't remember anyone specifically
 3  telling me no.  I think it was just ignored.
 4    Q. Okay, and who do you remember telling?
 5    A. One of the correction officers.  I don't
 6  remember.
 7    Q. Do you remember it being Officer Martin?
 8    A. No, ma'am.
 9    Q. Do you remember it being Officer Setliff?
10    A. I don't know which one it was.  I don't
11  remember.
12    Q. Did you say that the man who was assaulted
13  requested to be moved?
14    A. Yes, ma'am, I probably did.
15    Q. And where were you situated in the cell
16  that you could have heard that conversation?
17    A. I -- I was in the middle of the cell.
18    Q. And you heard him ask to be moved?
19    A. Yes, ma'am.  He was hollering for them to
```

-11-

```
20  take him out.
21    Q. Was he taken out?
22    A. A short while after, yes, ma'am.
23    Q. So if he asked to be moved and he was
24  moved, do you have any reason why you wouldn't have
25  been moved if you asked?
```

(Docket Entry 46-6 at 34.)

Simply put, this evidence constitutes no proof that Defendants Martin, Setliff, and Wilson (or any other deputy) knew Defendant Hayes assaulted another detainee before he assaulted Plaintiff. Moreover, earlier in his deposition, Plaintiff clearly testified that he did not see any deputy witness the prior assault, that "[i]t was [his] understanding that [deputies] did not know it was going on," and that, only "after it was all over with," did Defendants Martin and/or Setliff arrive and remove the victim, along with "all these [other] inmates [who had crowded into] the cell [to smoke cigarettes] . . . ." (Id. at 14-15.) At none of the points in his deposition where Plaintiff discussed these events did he aver that he heard the victim inform a deputy that Defendant Hayes had committed an assault. (See id. at 14-15, 26-27, 32-35.)[7]

Plaintiff additionally contends that, in his deposition, he "testified that he asked one of the three Defendant officers [i.e., Defendants Martin, Setliff, or Wilson] to move him from the cell after this [prior] assault out of fear for his own safety." (Docket Entry 48 at 13 (citing "Pyrtle Dep. pp. 124-126, 130, 135, 136").) However, in none of the cited testimony did Plaintiff aver

---

[7] The record also contains testimony from Defendants Martin, Setliff, and Wilson that they did not know of any assault by Defendant Hayes before his assault on Plaintiff. (Docket Entry 46-2 at 19-20; Docket Entry 46-3 at 17; Docket Entry 46-4 at 14-15.)

-12-

he told any deputy that Defendant Hayes committed an assault. (See Docket Entry 46-6 at 32-35.) To the contrary, pages 124 and 136 of Plaintiff's deposition transcript document nothing about the substance of any exchanges he had with any deputy (see id. at 32, 35) and the other cited (and surrounding) pages reflect that he testified to only these communications about the prior assault:

```
                                           Page 125
         . . . .
 6   Q. Did some guards come after that incident [i.e.,
 7 [the prior assault] had stopped?
 8   A. Eventually, yes, sir, because I -- they
 9 kind of told everybody that they had to go back to
10 their cells.
11   Q. I believe you indicated that you don't
12 remember saying anything to the officers about what
13 had happened at that time.  Correct?
14   A. I really didn't -- I really don't
15 remember.
16   Q. Did the man who had been assaulted, did he
17 say anything to the officers?
18   A. I think so, yes, sir.
19   Q. Were you concerned about being put back in
20 ---
21   A. --- Oh, yes, sir.
22   Q. --- The other cell with these same men?
23   A. Yes, sir.
24   Q. Did you say anything at that time?
25   A. It seems like I may have asked to be
                                           Page 126
 1 removed from that cell.
 2   Q. Why?
 3   A. For fear of my safety.
         . . . .
                                           Page 130
 1   Q. Okay, and you didn't say anything to those
 2 officers about moving you to a different cell?
 3   A. At -- at some point I said something to
 4 one of the officers.  I don't know whether it was
 5 [Defendant] Martin or Setliff.  It was just one of the
 6 Rockingham County jailers.
 7   Q. Okay.  Now, you testified earlier today
 8 that you don't remember requesting to be moved until
 9 after your assault.
10 Do you have a different memory of that
11 now?
12   A. Yes, ma'am, I -- I do.  I -- I feel like
```

-13-

13 that I -- I do remember that I asked to be moved.
14  Q. Okay, what do you remember saying
15 specifically?
16  A. Just that, you know, one person had
17 already been assaulted and that I -- I would feel
18 safer if I was somewhere else.
     . . . .

Page 131
7  Q. Now, when you say that you believe that
8 you made a request to be moved, do you remember being
9 asked questions about why you wanted to be moved?
10  A. I think I -- I think I stated it probably
11 before I -- I think I stated it before I even asked
12 to be moved.
13  Q. Okay, but were you asked any specific
14 questions?
15  A. Why, why I wanted to be moved.  That's the
16 only one I could remember.
17  Q. And what was the response?
18  A. Because someone else had already been
19 jumped in that cell.
     . . . .

Page 133
2  Q. And I think you may have said this, but
3 was the only reason that you remember giving for fear
4 of your safety?
5  A. Yes, ma'am.
6  Q. Did you mention [Defendant] Hayes or [another
7 cellmate] specifically?
8  A. Not that I remember.
9  Q. Did you mention the fight specifically?
10  A. Yes.
     . . . .
15  Q. But when they did come, you took that
16 opportunity to ask to be moved?
17  A. Yes, ma'am.
18  Q. To ask to be moved?
19  A. Yes, ma'am.
     . . . .

Page 135
     . . . .
3  Q. Is there anything else that you remember
4 about the conversation with the officer?
5 Did the officer just walk away after that?
6  A. I really don't remember.
7  Q. You don't remember how that conversation
8 would have ended?
9  A. No, ma'am.

(Id. at 32-35 (emphasis added).)

-14-

This evidence, even if taken in the light most favorable to Plaintiff, does not support an inference that the Sheriff Defendants (or any deputy) knew Defendant Hayes had committed an assault prior to his assault on Plaintiff.[8]  Further, even if the Court treated the record as permitting an inference that the Sheriff Defendants had general knowledge of Plaintiff's account of the prior assault (which it should not), they only would have known from such account that, while a group of 10 or more detainees crowded into Plaintiff's unlocked cell for the purpose of sharing two cigarettes after supper, Defendant Hayes grabbed one member of the group around the neck and held him so two other detainees could remove his socks in search of a third cigarette. (See Docket Entry 46-6 at 14-16.)  Knowledge of such facts would not suffice to establish deliberate indifference in this case because that standard also requires evidence sufficient to show that the Sheriff Defendants subjectively inferred that Defendant Hayes posed a substantial risk of assaulting Plaintiff if the two men remained in the same cell over-night.  See Farmer, 511 U.S. at 837.

In other words, "Farmer, and [the Fourth Circuit's] cases interpreting Farmer, make clear that general knowledge of facts creating a substantial risk of harm is not enough.  The prison [or jail] official must also draw the inference between those general facts and the specific risk of harm confronting the inmate."

---

[8] At most, this evidence would support an inference that one of the Sheriff Defendants knew that, during a time in which numerous detainees from other cells had crowded into the cell Plaintiff shared with Defendant Hayes and two others, an assault took place and, as a result, Plaintiff feared for his safety.

-15-

Johnson v. Quinones, 145 F.3d 164, 168 (4th Cir. 1998); see also Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("A defendant is not subjectively reckless where, although he is aware of the existence of a general risk, he is unaware that his conduct is inappropriate in light of that risk. True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). The facts (as recounted by Plaintiff) regarding the prior assault by Defendant Hayes do not reveal a risk of harm to Plaintiff from Defendant Hayes so "obvious," Farmer, 511 U.S. at 842, that a reasonable fact-finder could determine (from such evidence alone) that the Sheriff Defendants, in fact, inferred the existence of a substantial risk that Defendant Hayes would assault Plaintiff when the two were locked in their cell for the night.[9]

---

[9] Indeed, when asked: "Was there anything that gave you reason to believe that [Defendant] Hayes was going to hurt you for some reason?" (Docket Entry 46-6 at 20-21), Plaintiff answered: "No, ma'am, or I would have never shut my eyes" (id. at 21). If Plaintiff did not subjectively infer from the prior assault that Defendant Hayes presented a substantial threat to Plaintiff that night, Plaintiff cannot reasonably contend that a fact-finder properly could conclude that, if possessed of the same knowledge as Plaintiff about the prior assault, the Sheriff Defendants did subjectively infer the existence of such a risk. Consistent with this understanding, another court in this Circuit has ruled that mere knowledge of facts showing a general risk of harm cannot satisfy the subjective inference element of a failure-to-protect claim "unless (a) the plaintiff had been subject to specific threats; (b) the risk of attack was pervasive at the facility; or (c) the plaintiff belonged to a class identified as vulnerable to assaults . . . ." Randolph v. Maryland, 74 F. Supp. 2d 537, 542 (D. Md. 1999). The circumstances of Defendant Hayes's prior assault and his subsequent over-night housing with Plaintiff do not meet those criteria.

-16-

To hold otherwise effectively would mandate as a matter of constitutional law that, whenever a fight occurs in a jail, the officials in charge immediately must place anyone who may have acted as an aggressor in indefinite solitary confinement to avoid liability for any future assault that detainee might commit. Of course, immediately and indefinitely administratively segregating all such detainees inevitably will expose jails to constitutional litigation as well. See Shrader v. White, 761 F.2d 975, 980 (4th Cir. 1985) ("Methods used by prison administrators to protect inmates from one another are often attacked as oppressive or as constituting cruel and unusual punishment by the same inmates who later complain about a lack of protection."); Rogers v. Shoaf, Nos. 1:07CV326, 1:07CV327, 2010 WL 2629519, at *9-14 (M.D.N.C. June 28, 2010) (unpublished) (addressing detainee's challenge to solitary confinement imposed as administrative measure). The Court should decline to construe the law in a fashion that creates such a conundrum: "[O]fficials must not be forced to walk a tightrope and face the prospect of a lawsuit no matter which way they turn." Grayson v. Peed, 195 F.3d 692, 696 (4th Cir. 1999).

Nor has Plaintiff identified evidence that would allow a reasonable fact-finder to conclude that any constitutionally actionable failure by the Sheriff Defendants to have Defendant Hayes placed in administrative segregation resulted from a policy or custom of the Office of the Sheriff of Rockingham County to allow detainees who committed assaults in the Jail to remain in shared cells, as required to sustain Plaintiff's official-capacity,

-17-

failure-to-protect claim, see, e.g., Board of Cnty. Comm'rs, 520 U.S. at 403; Giancola, 830 F.2d at 550; McFadyen, 786 F. Supp. 2d at 954. (See Docket Entry 48.) In fact, uncontradicted testimony in the record reflects that, at the time of this incident, the Jail had a policy and custom of placing detainees who acted violently within the Jail into single-person cells, if space permitted. (See Docket Entry 46-3 at 17 (Defendant Setliff: "[I]f [detainees] were violent in the [J]ail, I believe you would have justification to move them to a tight cell."); see also Docket Entry 46-2 at 5 (Defendant Martin: "Tight cell is a single cell."); Docket Entry 46-4 at 14 (documenting testimony from Defendant Wilson that single-person cells were used for "suicide people" and "people that gave so much problem," as well as that detainees who "showed any kind of force against other inmates" were separated from them).)

In sum, the record (even if viewed in the light most favorable to Plaintiff) cannot, as a matter of law, support a failure-to-protect claim premised on the prior assault by Defendant Hayes.

### b. Lack of Classification

Plaintiff's summary judgment response brief also asserts that:

> Plaintiff has met his burden of showing that the failure of jail officials to separate him from Defendant Hayes created a substantial risk of serious harm in that [Defendant] Hayes was a violent felon who had previously been charged with attempted murder . . . . Further, Plaintiff has met his burden of showing that jail officials acted with deliberate indifference to inmate health or safety in that . . . Defendant Martin had seen Defendant Hayes'[s] criminal record prior to Plaintiff being assaulted . . . [and] Defendant Martin acknowledged that the policy of housing felons with non-violent offenders was dangerous because of the risk of assault.

-18-

(Docket Entry 48 at 14.) In making this assertion, however, Plaintiff fails to cite any authority that the Constitution requires jail officials to segregate detainees based on the nature of their pending or prior charges. (See id.) Moreover, authority actually supports the contrary conclusion.

As an initial matter, the United States Supreme Court recently emphasized that "[t]he difficulties of operating a detention center must not be underestimated by the courts. Jails (in the stricter sense of the term, excluding prison facilities) admit more than 13 million inmates a year. The largest facilities process hundreds of people every day; smaller jails may be crowded on weekend nights, after a large police operation, or because of detainees arriving from other jurisdictions." Florence v. Board of Chosen Freeholders of Cnty. of Burlington, ___ U.S. ___, ___, 132 S. Ct. 1510, 1515 (2012) (internal citations omitted). Given these considerations, the Supreme Court decreed that jail officials "must have substantial discretion to devise reasonable solutions to the problems they face." Id. Constitutionalizing a requirement of detainee segregation based on pending or past charges does not afford proper deference to jail officials in handling problems associated with the housing of detainees.

Additionally, in Florence, the Supreme Court based its holding (which rejected a Fourth Amendment challenge to invasive searches of persons jailed upon arrest for minor offenses) on the understanding that "interaction and mingling between misdemeanants and felons" will occur in jails, id. at 1521, and that, in

-19-

processing detainees into jails, "[i]t also may be difficult, as a practical matter, to classify [them] by their current or prior offenses," id. If the Constitution mandated separation of detainees charged with minor offenses from detainees charged with felonies, the Supreme Court would not have relied on the foregoing considerations. Further, in rendering its ruling in Florence, the Supreme Court laid out a number of reasons why classification of detainees based on the nature of their current or prior charges largely does not make sense:

1) "[p]eople detained for minor offenses can turn out to be the most devious and dangerous criminals," id. at 1520; see also Tennessee v. Garner, 471 U.S. 1, 14 (1985) ("[N]umerous misdemeanors involve conduct more dangerous than many felonies."); Street v. Surdyka, 492 F.2d 368, 372 (4th Cir. 1974) ("The difference between felonies and misdemeanors is no longer as significant as it was at common law.");

2) "[a]n arrestee may be carrying a false ID or lie about his identity," Florence, ___ U.S. at ___, 132 S. Ct. at 1521; and

3) jail officials handling intake "often do not have access to criminal history records . . . [a]nd those records can be inaccurate or incomplete," id.

Finally, the Supreme Court observed that:

Even if [jail officials] had accurate information about a detainee's current and prior arrests, [they] . . . would encounter serious implementation difficulties [in classifying detainees]. They would be required, in a few minutes, to determine whether any of the underlying offenses were serious enough to [trigger a particular classification]. Other possible classifications based on characteristics of individual detainees also might prove

-20-

> to be unworkable or even give rise to charges of discriminatory application.

Id. at 1521-22.

Given these circumstances, the Supreme Court's explanation for its refusal to construe the Constitution to require jail officials to classify detainees based on the nature of their present or past charges for purposes of intake searches applies equally to the question presented in this case, i.e., should this Court construe the Constitution to require jail officials to classify detainees based on the nature of their present or past charges for purposes of cell assignment. The Court thus should refuse to adopt such a construction of the Constitution and should conclude that the failure of the Sheriff Defendants to separate Plaintiff from Defendant Hayes based on differences in the seriousness of their then-pending or prior charges cannot, as a matter of law, sustain Plaintiff's failure-to-protect claim.

Other courts have reached the same result in parallel contexts. See Crow v. Montgomery, 403 F.3d 598, 600-02 (8th Cir. 2005) (reversing denial of jail officials' summary judgment motion on claim for failure-to-protect brought by "nonviolent offender" who suffered injury at hands of other detainees and contended, inter alia, that "detainees were inadequately classified"); Shaffer v. Reno, No. 94-2033, 66 F.3d 328 (table), 1995 WL 555018, at *4 (7th Cir. Sept. 13, 1995) (unpublished) ("Even accepting as true that pretrial detainees, misdemeanants and convicted felons were housed together . . ., that matter does not provide a sufficient basis from which to infer deliberate indifference. Administrators

-21-

in many states are unable to house each inmate only with those of a similar status. The plaintiff has provided no evidence whatsoever that the absence of a prisoner classification system contributed to inmate violence." (internal brackets, citations, and quotation marks omitted)); Freeman v. Troutt, No. 3:10CV697, 2012 WL 5439160, at *5-7 (M.D. Tenn. Nov. 7, 2012) (unpublished) ("The crux of the plaintiff's objection as to this claim is that he has adduced sufficient evidence demonstrating that [the] defendant [], in her official capacity, implemented a de facto policy or custom of mingling inmates charged with violent felony offenses together with those charged with non-violent misdemeanors in the general housing unit of the jail and that, through this alleged policy or custom, [the defendant] failed to protect the plaintiff from inmate violence. . . . Aside from pointing to the fact that he was housed in the general population unit of the jail with inmates charged with violent felony offenses, the plaintiff has presented no evidence showing that jail officials knew of and disregarded an excessive risk to his safety. . . . In sum, the plaintiff has failed to offer evidence showing that jail officials were aware of any facts from which it could be inferred that the plaintiff faced a substantial risk of serious harm. See Farmer, 511 U.S. at 837. Because the plaintiff has failed to adduce evidence sufficient to show that the harm to him was caused by a constitutional violation, the plaintiff cannot succeed on his official capacity claim . . . under 42 U.S.C. § 1983."); Lacy v. Sheldon, No. 1:10CV1974, 2011 WL 93719, at *1-2 (N.D. Ohio Jan. 11, 2011) (unpublished) (holding

that the plaintiff could not show deliberate indifference based on allegation that "[d]etainees charged with felonies and detainees charged with misdemeanors are housed together").

### ii. Deliberate Indifference after Assault Began

At his deposition, Plaintiff testified that the following events occurred just before, during, and after his assault:

1) when "lights-out" time came, Plaintiff was "in the cell with [Defendant] Hayes, [as well as two other detainees with the last names of] Connors and Adkins" (Docket Entry 46-6 at 12);

2) because Plaintiff "had gotten up pretty early and [he] was pretty tired . . . [he] just went to sleep . . . [while Defendant Hayes] and Mr. Connors were doing pushups" (id.);

3) Plaintiff "was awakened by being assaulted [by] . . . [Defendant] Hayes . . . [and heard] scuffling to [his] left [as] . . . Adkins was trying to get away from [] Connors" (id.);[10]

4) within about "three minutes," Defendant Martin arrived "at the cell . . . [and] tried to gain compliance . . . [v]erbally [but] . . . [Defendant] Hayes . . . continued to assault [Plaintiff,] . . . went to the bars and taunted [Defendant] Martin

---

[10] According to Plaintiff's deposition testimony, Defendant Hayes first "stomped" Plaintiff's "head," as well as his "chest [and] shoulder area," while he "was laying on a mat . . . on the floor," and then, as Plaintiff "tried to get to his feet," Defendant Hayes used his "fists." (Docket Entry 46-6 at 12.) Plaintiff averred that, even when he got to his feet, he could only "cover[] up, because [he] couldn't see . . . out of [his] right eye . . . [which had] swollen shut . . . ." (Id.) Plaintiff nonetheless maintained that he could see which deputies were present in and around his cell during the assault. (Id. at 22.)

. . . [and then] ran across the floor and punched [Plaintiff] in the face" (id. at 13);

5) Defendant Martin thereafter "left the cellblock and came back with . . . [Defendant] Setliff," whereupon both deputies "tried to gain control -- verbal control" (id.; see also id. at 27 (agreeing that, "when [Defendant] Setliff arrived, Connors was still attacking Adkins"));

6) "at some point [Defendant] Martin sprayed OC spray," but, despite that, Defendant Hayes "went to the bars again, still chattering at [Defendant] Martin . . . [and Plaintiff] got punched again from a walking [or] running start" (id. at 13-14; see also id. at 16 (indicating that Defendant Martin only deployed OC spray after returning with Defendant Setliff), 17 (same), 20 (same), 22 (stating that Defendant Hayes hit Plaintiff "several" times after Defendant Martin used OC spray);[11]

7) Defendant Hayes ultimately did "stop assaulting [Plaintiff] . . . sometime after the OC spray had been sprayed" (id. at 14; see also id. at 17-18 (agreeing that Connors also stopped assaulting Adkins at some point after OC spray deployment), 28 (agreeing that, after Defendant Martin used OC spray, "eventually Hayes and Connors did stop assaulting [Plaintiff] and Adkins"));

---

[11] Defendant Martin's deposition testimony (taken in the light most favorable to Plaintiff) reflects that Defendant Hayes struck Plaintiff at least once after Defendant Martin's use of OC spray during a time at which Defendant Setliff had left the cell area (apparently to take Defendant Wilson's place in the control room so she could come to the cell area to perform her supervisory duty of assessing the situation). (See Docket Entry 46-2 at 17-18.)

-24-

8) "after [Defendant Hayes] had stopped hitting [Plaintiff] . . . and after the OC spray[,] . . . [Defendant Hayes] complied . . . [when Defendants Martin and Setliff] asked him to come to the front of the bars and they handcuffed him to the bar" (id. at 22);

9) "[n]ear the very end [of these events, Defendant Wilson] showed up at the cell door, and [at] about that time they -- they ended up getting [Plaintiff] out" (id. at 15; see also id. at 17 (agreeing that Defendant Setliff left cell area prior to Defendant Wilson arriving and stating that, when she arrived, Plaintiff asked her "to please get [him] out," just as he had asked "a dozen times" since "[Defendant] Martin showed up the first time"), 20 (stating that his "being hit" by Defendant Hayes "had stopped" when Defendant Wilson arrived and agreeing that she "wouldn't have seen any part of the fight"));

10) as Plaintiff left the cell, Defendant Hayes landed a final "glancing blow . . . [to] the back of [Plaintiff's] head," despite the fact that Defendant Hayes "was handcuffed on the left-hand side of the door" (id. at 29);

11) Defendant Martin then took Plaintiff to a "small area where there's a washing machine . . . and a little small sink [and] . . . handed [him] a wash rag and told [him] to try to clean [him]self up a little bit" (id. at 18);

12) "after [Plaintiff] tried to wash a little bit of the blood off [his] face and tried to wash [his] eyes out a little better, they had handcuffed [him] to a chair right outside of that laundry room, kind of facing . . . the control room" (id. at 19); and

-25-

13) after Plaintiff "ask[ed],"[12] Defendant Martin took him to the hospital, where he got "a CAT scan," from which he learned that, in addition to "knock[ing] one of [his] teeth out [and] br[eaking] another one," the assault had "crushed [his] entire orbital socket" (id.; see also id. at 23-24 (stating that doctor at hospital gave him "four [or] five stitches" and referred him to a "plastic surgeon," which referral ultimately led to 10 surgeries)).

Plaintiff's summary judgment response brief argues that:

> [The] decision to keep [him] confined in a cell with Defendant Hayes after [Defendant] Hayes'[s] initial assault [upon him] until [Defendant Wilson] could assess the situation and send [Defendant Setliff] back to remove Plaintiff posed an objective risk of serious harm (which materialized into serious permanent injury) to Plaintiff. In this case, immediately after Plaintiff was initially assaulted, [Defendant] Martin had the opportunity to either enter the cell and remove Plaintiff or open the cell and allow [him] to leave. . . .

> Defendant Martin knew [the assault might continue] and believed he could enter the cell and protect himself and [Plaintiff] from harm, but failed to do so because of [Defendant Page's] policy, which forbade [Defendant Martin's] entry in any circumstance.

> [Defendant] Martin ordered Defendant Hayes to cease his assault and used his OC spray on [Defendant] Hayes . . . [who] became compliant. At this point, [Defendant] Martin could have opened the cell to remove Plaintiff or entered and removed Plaintiff. . . . Defendant Hayes was only temporarily incapacitated [and] very likely could have been further angered by being pepper sprayed by [Defendant] Martin and likely would continue to assault Plaintiff. [Defendants Martin and Setliff] were present at the cell while Defendant Hayes and all other inmates were compliant, and could have entered and removed Plaintiff at any point during this time. The failure to do so after Defendant Hayes had shown his intent to assault Plaintiff placed the Plaintiff at an objective

---

[12] Plaintiff testified, more specifically, that he said he "was hurt, that [he] couldn't stop bleeding [from his cheek] and that [he] wanted to go to the hospital." (Docket Entry 46-6 at 19.)

risk of harm, which was realized when Plaintiff was struck one to three more times after [Defendant] Setliff left to allow [Defendant Wilson] to assess the situation.

(Docket Entry 48 at 9-10 (internal citation and quotation marks omitted); see also id. at 11 (criticizing Sheriff Defendants because "they subjectively chose to prioritize policy and their own safety over the health and safety of Plaintiff")).

Again, Plaintiff has cited no authority to support his position that the foregoing circumstances would permit a finding of deliberate indifference. (See id.) Moreover, other courts have recognized that, notwithstanding the duty of government officials "to protect [inmates] from violent assaults by other inmates" (as recognized in Farmer), "immediate intervention in an inmate-on-inmate assault is not necessary." Eddmonds v. Walker, 317 F. App'x 556, 558 (7th Cir. 2009) (citing Guzman v. Sheahan, 495 F.3d 852, 857-59 (7th Cir. 2007)).[13] In other words, "to the extent that

---

[13] "In Guzman the corrections officer saw a pretrial inmate punch the plaintiff and hit him in the head with a broom; in upholding summary judgment for the defendant, [the Seventh Circuit] agreed that [the officer] was not deliberately indifferent to the inmate's safety when she left her post for about three minutes in search of backup, which arrived within minutes and subdued the inmates." Eddmonds, 317 F. App'x at 558 (citing Guzman, 495 F.3d at 853-54, 858-59). In Eddmonds, the Seventh Circuit again affirmed a grant of summary judgment for corrections officials where the plaintiff "was asleep at 3:30 a.m. when his cellmate [] violently attacked him . . . [by] stabbing him with a pen in the left eye and punching him in the face. . . . [The two officers who] arrived at the cell first . . . saw [the attacker] putting [the plaintiff] in a chokehold . . . . Both officers yelled at [the attacker] to 'stop' and 'let him go,' or they would use chemical spray. Within three to five minutes [a third officer] arrived at the cell. By that point [the attacker] had released [the plaintiff from the chokehold] and retreated to the back of the cell, and [the plaintiff] had approached the officers at the front of the cell. [An officer] told [the plaintiff] he would open the
(continued...)

[P]laintiff's complaint may be read to challenge the policy or protocol that prevent[ed] [Defendant Martin] from becoming physically involved in [this] altercation and require[d] him to wait for back-up to arrive, that claim also fails on the merits. It is well settled that the realities of running a penal institution [or jail] are complex and difficult, and the policies instituted by prison [or jail] administrators are entitled to great deference by the [C]ourt." Sipe v. Harder, No. 9:08CV1365, 2010 WL 3418382, at *11 (N.D.N.Y. Aug. 4, 2010) (unpublished) (internal quotation marks omitted), recommendation adopted, 2010 WL 3418388 (N.D.N.Y. Aug. 26, 2010) (unpublished).[14]

Indeed, as noted above in Section II.A.i.b., the Supreme Court expressly has held that jail officials "must have substantial discretion to devise reasonable solutions to the problems they face." Florence, ___ U.S. at ___, 132 S. Ct. at 1515; see also Whitley v. Albers, 475 U.S. 312, 321 (1985) ("When the ever-present potential for violent confrontation and conflagration ripens into

---

[13](...continued)
cell door if [the plaintiff] would let them handcuff him, but [the plaintiff] refused because he feared being constricted as long as [the attacker] remained in the cell. But [the plaintiff] eventually relented, and the officers opened the cell door and restrained both inmates." Id. at 557.

[14] The fact that Defendant Martin may have believed he could have adequately defended himself against Defendant Hayes and/or Connors does not make the policy precluding Defendant Martin from opening the cell and physically intervening (or his decision to abide by that policy) unreasonable, much less deliberately indifferent. Such policies exist to restrain the heroic (but perhaps misguided) impulses of individual officers and to relieve them of the burden of making split-second, judgments in the midst of a crisis, particularly when caution rather than valor may best promote the security of the facility as a whole.

*actual* unrest and conflict, the admonition that a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators carries special weight." (internal citations and quotation marks omitted) (emphasis in original)). Further, "an official who responds reasonably to a known risk has not 'disregarded an excessive risk to inmate health or safety' and has therefore not acted with deliberate indifference." Brown, 240 F.3d at 389 (internal brackets and citation omitted) (quoting Farmer, 511 U.S. at 837). As the above-quoted excerpt from his summary judgment response brief reflects, Plaintiff, like another litigant in an analogous case, "asserts, however, that [Defendant Martin] failed to take reasonable measures because he stood off shouting orders for [Defendant Hayes] to stop instead of attempting to physically subdue him," Blaylock v. Borden, 547 F. Supp. 2d 305, 312 (S.D.N.Y. 2008), aff'd, 363 F. App'x 786, 787 (2d Cir. 2010).

Like that court, this Court should hold that "the assertion that [Defendant Martin] acted improperly by calling for officer assistance instead of jumping into the fight himself is itself unreasonable." Id. (ruling that "deliberate indifference [claim] fails as a matter of law" in light of officer's "actions - arriving promptly on the scene, calling for immediate assistance, and ordering the men to place their hands on the wall"); accord Sipe, 2010 WL 3418382, at *12 (stating that officer "did exactly as he should have . . . [by following] train[ing] not to become involved in an inmate altercation . . . [and instead] wait[ing] for back-up . . . [given the] security risk . . . for the guard as well as the

-29-

rest of the inmates in the unit"). Similarly, "in not opening the cell door [until they received supervisory approval], [Defendants Martin and Setliff] were following an institutional policy meant to protect the safety of officers. A trier of fact could not characterize [their] response to the altercation as any less reasonable than [that of officers in other cases where courts have granted summary judgment]." Eddmonds, 317 F. App'x at 559.[15]

Accordingly, as to the portion of the First Claim for Relief that seeks to impose constitutional liability on the Sheriff Defendants for failing to protect Plaintiff after his assault by Defendant Hayes began, the evidence taken in the light most favorable to Plaintiff falls short as a matter of law.[16]

---

[15] The fact that Defendants Martin and Setliff had to concern themselves with two aggressors in the cell underscores the reasonableness of their decision to await supervisory approval before opening the cell door (either to attempt to physically restrain Defendant Hayes or to let Plaintiff exit). Had both Defendant Hayes and Connors rushed Defendants Martin and Setliff when they opened the cell door, a very dangerous situation could have engulfed other areas of the Jail. Moreover, Plaintiff's deposition testimony (quoted above) reflects that Defendants Martin and Setliff achieved a significant measure of physical restraint over Defendant Hayes by getting him handcuffed to the bars. The Court should decline Plaintiff's request that it allow a jury to second-guess the decision of Defendants Martin and Setliff to secure Defendant Wilson's input before opening the cell door. As another court observed in adjudicating a deliberate indifference claim, "the search for blame or fault, particularly with the benefit of hindsight, can too easily infect what must be a dispassionate analysis. Simply laying blame or fault and pointing out what might have been done is insufficient. The question is not whether the jailers did all they could have, but whether they did all the Constitution requires." Rellgergert by Rellergert v. Cape Girardeau Cnty., Mo., 924 F.2d 794, 797 (8th Cir. 1991).

[16] The First Claim for Relief also asserts in conclusory terms that "Defendant [] Page failed to properly train [Defendants] Martin[,] Setliff and [] Wilson on . . . the proper ways to . . .
(continued...)

-30-

Plaintiff's "Second Claim for Relief" (labeled as "Negligence") asserts that:

> Defendant [] Page . . . had a duty to adequately train [his] deputies . . . to ensure that their actions did not cause an unreasonable risk of harm to Plaintiff . . . [and] Defendant [] Page breached this duty by . . . failing to properly train [Defendants Martin, Setliff, and Wilson] . . . the proper ways to:
>
> a.   communicate with other Deputies;
> b.   recognize dangerous and/or aggressive inmates;
> c.   respond to inmate attacks on other inmates;
> d.   neutralize inmate attacks with and without the use of force or OC spray;

---

[16](...continued)
provide timely medical attention."  (Docket Entry 17, ¶ 32.)  In moving for summary judgment, the Sheriff Defendants cited record evidence showing that "[a]pproximately an hour and 24 minutes elapsed between the assault [on Plaintiff by Defendant Hayes] and [P]laintiff's arrival at the hospital."  (Docket Entry 41 at 13.)  They further argued (with citation of persuasive authority) that "[d]elay in the receipt of medical care only constitutes deliberate indifference where Plaintiff can show that the delay caused substantial harm. . . .  There is no medical evidence that [his] condition would have improved had he arrived at the hospital sooner.  Thus, [P]laintiff's deliberate indifference claim fails." (Id. at 14.)  In his summary judgment response brief, Plaintiff took note of, but did not contest, the Sheriff Defendants' argument in this regard.  (See Docket Entry 48 at 11-17.)  Given the authority cited by the Sheriff Defendants on point and the failure of Plaintiff to challenge that authority or to identify any evidence to sustain a claim in light of that authority, Plaintiff has not raised a material question of fact regarding delayed medical care and the Court thus should enter judgment as a matter of law for the Sheriff Defendants on any related failure-to-train claim.  See Young v. City of Mount Ranier, 238 F.3d 567, 579 (4th Cir. 2001) ("The law is quite clear in this circuit that a section 1983 failure-to-train claim cannot be maintained against a governmental employer in a case where there is no underlying constitutional violation by the employee.").  To the extent the First Claim for Relief contains claims for failure-to-train in connection with the duty of jail officials to provide reasonable safety for detainees, those claims also cannot proceed in light of Young, given the absence (as detailed in Section II.A.) of any viable constitutional claim for failure-to-protect.

> e.  protect the general inmate populous from those inmates who are dangerous and aggressive; and
>
> f.  segregate the dangerous and aggressive inmates from the general inmate populous.

(Docket Entry 17, ¶¶ 42-43.)

To make out a negligence claim under North Carolina law, a plaintiff must show: "(1) a legal duty; (2) a breach thereof; and (3) injury proximately caused by the breach." Stein v. Asheville City Bd. of Educ., 360 N.C. 321, 328, 626 S.E.2d 263, 267 (2006). In moving for summary judgment, Defendants Page and OCIC have argued (in detail and with citation of authority) that, in light of the doctrine of governmental immunity under North Carolina law, Plaintiff cannot proceed with a negligence claim directly against Defendant Page in his official capacity, but instead may recover on this claim, if at all, only against Defendant Page's statutorily-required bond. (See Docket Entry 44 at 3-8.) Plaintiff's summary judgment response brief does not contest this argument. (See Docket Entry 49 at 1-3.) Regarding his negligence claim as against Defendant Page's bond, Plaintiff contends that he:

> presented sufficient evidence that [Defendant] Martin, [Defendant] Setliff and [Defendant] Wilson were negligent by inter alia: placing [] [P]laintiff in a cell with a dangerous felon inmate, failing to initially enter the cell to protect [] [P]laintiff, failing to enter the cell when Defendant[s] [] Martin and Setliff were present, failing to enter the cell when Defendant[s] [] Martin and Wilson were present, failing to timely provide medical attention, failing to properly supervise the officers on the scene, failing to properly train on [Defendant Page's] policies and procedures, and failing to ensure that [Defendant] Martin and [Defendant] Setliff understood the proper policies and procedures.

(Id. at 2.) Neither evidence before the Court nor relevant authority support Plaintiff's contentions in this regard.

-32-

First, for reasons documented in Section II.A.i.a., the record does not provide a basis from which a reasonable fact-finder could discern that Defendants Martin, Setliff, and/or Wilson (or any deputy) had any notice that Defendant Hayes had acted assaultively within the Jail before he assaulted Plaintiff. Second, as detailed in Section II.A.i.b., the housing of detainees charged with felonies and misdemeanors occurs routinely across the country (indeed, so routinely that the United States Supreme Court factored that consideration into its determination that jail officials may invasively search persons admitted to their facility upon arrest for minor offenses). Third, Plaintiff has offered no authority that North Carolina imposes a duty on sheriffs to segregate detainees based on pending or past charges and (again, as set out in Section II.A.i.b.) the United States Supreme Court has detailed numerous reasons why requiring classification on such grounds makes little sense. Fourth, in light of authority outlined in Section II.A.ii, Defendants Martin and/or Setliff acted reasonably by abiding by the policy which precluded him/them from entering Plaintiff's cell without backup and/or supervisory approval. Fifth, as noted in Footnote 16 within Section II.A.ii., Plaintiff has not identified evidence that any delay in his transportation to the hospital resulted in any harm. Sixth, Plaintiff has cited no evidence demonstrating that any specific failure of supervision or training by Defendant Wilson proximately injured Plaintiff.

Given these shortcomings in Plaintiff's showing of inadequate performance by Defendants Martin, Setliff, and Wilson, Plaintiff

cannot, as a matter of law, establish that negligent training by Defendant Page proximately caused any injury. See Prior v. Pruett, 143 N.C. App. 612, 622, 550 S.E.2d 166, 172-73 (2001) (ruling that claim sheriff was "negligent in failing to establish reasonable procedures, including [regarding] the training of subordinates . . . [, was] derivative and dependent on the resolution of the negligence claims against the [sheriff's deputies] . . . [and that] [w]ithout a underlying negligence charge against the deputies, a claim of negligence against the [s]heriff . . . can not be supported"), review denied, 355 N.C. 493, 563 S.E.2d 572 (2002). Further, in opposing summary judgment on this claim, Plaintiff has failed to present evidence of any specific deficiency in the training Defendant Page testified he mandates for deputies (Docket Entry 47-5 at 5-7) and that Defendant Martin, Setliff, and Wilson averred they received (Docket Entry 47-2 at 3-4; Docket Entry 47-3 at 4, 6-7; Docket Entry 47-4 at 4). (See Docket Entry 49 at 1-3.)[17]

Under these circumstances, the Court should enter summary judgment for Defendant Page on Plaintiff's negligence claim.

_____

[17] Even at the pleading stage, "[i]t is simply not enough to allege that a sheriff had a duty to train and failed to train . . . ." North Carolina ex rel. Bishop v. County of Macon, No. 2:10cv9, 2010 WL 7351864, at *12 (W.D.N.C. Oct. 12, 2010) (unpublished), adopted in relevant part, 809 F. Supp. 2d 438, 448 (W.D.N.C. 2011), reversed in part on other grounds, No. 11-2021, 2012 WL 2366162 (4th Cir. June 22, 2012) (unpublished); see also id. at *12 n.9 (construing complaint to allege negligence as alternative to Section 1983 claim). "[R]ather, plaintiffs are obliged to allege the facts that inform such legal conclusions. Did the sheriff waive [standard] training for this deputy? Was the sheriff aware of an ongoing problem with the deputy which he failed to address?" Id. Similarly, at the summary judgment stage, a litigant pursuing a negligent training claim against a sheriff must come forward with evidence showing such specific deficiencies.

## C. Fifth Claim for Relief -- Excessive Force

As to this final claim, Plaintiff asserts that "[t]he use of OC spray on Plaintiff by [Defendant] Martin while Plaintiff [] was being attacked by Defendant Hayes served no legitimate law enforcement objective but constituted unreasonable and excessive force . . . ." (Docket Entry 17, ¶ 57.) As noted in Section I, the FAC purports to ground this claim on both the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment; however, the Fourth Circuit has made it clear that "excessive force claims of a pretrial detainee or arrestee are governed by the Due Process Clause of the Fourteenth Amendment." Orem v. Rephann, 523 F.3d 442, 446 (4th Cir. 2008) (internal brackets and quotation marks omitted). The Fourth Circuit further has explained that:

> To succeed on an excessive force claim under the Due Process Clause of the Fourteenth Amendment, [a plaintiff] must show that [a government official] inflicted unnecessary and wanton pain and suffering. In determining whether this constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force used, the extent of the injury inflicted, and <u>whether the force was applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm</u>.

<u>Id.</u> (internal brackets, citations, and quotation marks omitted) (emphasis added).

In moving for summary judgment on this claim, the Sheriff Defendants argued that "[i]t is clear from the record that [Defendant] Martin used the OC spray to gain compliance from the two aggressive inmates, [Defendant] Hayes and [] Connors. . . . He

-35-

did not apply the force maliciously and sadistically for the purpose of causing harm, but rather used the OC spray to stop the two assaults." (Docket Entry 41 at 16.) Moreover, the Sheriff Defendants observed that, in his deposition, Plaintiff admitted he "believe[d] that the OC spray was used to stop the assault." (Id. (citing "Pyrtle Dep. p. 105-06").)[18]

Under the heading "Plaintiff Has Forecast Sufficient Evidence that Defendant Martin Used Excessive Force," Plaintiff's summary judgment response brief offers the following rejoinder to the Sheriff Defendants' foregoing argument:

> [Defendant] Martin was aware that Plaintiff was not the aggressor and was instead the victim of Defendant Hayes'[s] vicious assault. Instead of using the OC spray only against the aggressor [Defendant] Hayes, Defendant Martin sprayed it in the vicinity of [Defendant] Hayes and Plaintiff, knowing that cross contamination was a real risk and that such contamination would cause Plaintiff great pain. Mr. Jon Blum, an expert in the use of force has given the opinion that [Defendant] Martin's use of pepper spray was incorrect and ineffective. (Report of Jon Blum, p. 3). Defendant Martin testified

---

[18] Those two cited pages of Plaintiff's deposition include these exchanges:

```
23   Q. Do you have any reason to dispute the fact
24 that the OC spray was used so that you and Adkins
25 would not continue to be assaulted?
1    A. No, ma'am.
2    Q. Is that what you believe happened?
3    A. I believe that was its intended purpose,
4  yes, ma'am.
     . . . .
16   Q. And it says in paragraph 57 that the use
17 of the OC spray served no legitimate law enforcement
18 objective.
19 But you would agree that it was used to
20 stop you from being further assaulted?
21   A. Yes, ma'am, that's what I would say.
```

(Docket Entry 46-6 at 27-28.)

that he believed he could have entered the cell and protected [Plaintiff] and defended himself, which would have eliminated the need for the use of OC spray. Rather than do this he chose to spray in the vicinity of Plaintiff whom he knew had suffered life-threatening injuries. This conduct is objectively and subjectively unreasonable as there was no need to use force against Plaintiff. Plaintiff presented no threat to [Defendant Martin] or any other inmate, and [Defendant] Martin made no attempt to use the OC spray properly to temper the severity of his forceful response against Plaintiff.

(Docket Entry 48 at 17-18.)

As the foregoing verbatim quotation of the entirety of his argument on this point documents, Plaintiff has cited no authority for his position that an officer's "incorrect and ineffective" use of pepper spray in a good-faith effort to stop an assault constitutes excessive force within the meaning of the Fourteenth Amendment. Nor has the undersigned Magistrate Judge located any such authority. Research, however, has uncovered a recent federal appellate decision declaring that, as a matter of law, the use of pepper spray in an attempt to stop an inmate-on-inmate assault, even if ultimately ineffective, constitutes a reasonable course of action, Bistrian v. Levi, 696 F.3d 352, 372 (3d Cir. 2012), another federal circuit court's ruling rejecting an excessive force claim by inmates who claimed that they suffered cross-contamination from prison officials' use of pepper spray to stop an inmate altercation, Clement v. Gomez, 298 F.3d 898, 901-04 (9th Cir. 2002), and a district court's dismissal of an excessive force claim based on an explicit determination that "[u]sing pepper spray to stop a fight or attack would not be the malicious and sadistic use

of force," <u>Lopez v. Vindiola</u>, No. C 09-3869 SI (pr), 2010 WL 1879111, at *2 (N.D. Cal. May 10, 2010) (unpublished).

Further, review of the page of the expert's report cited by Plaintiff reveals that said expert did not opine that Defendant Martin's use of OC spray was "ineffective," but instead stated only that Defendant Martin's incorrect use of OC spray "limit[ed] its potential effectiveness." (Docket Entry 46-1 at 4.) Moreover, the report's "Incident Summary" states that:

> After calling for assistance, [Defendant] Martin ordered [Defendant] Hayes and Connors to "back off." [Defendant] Hayes and Connors did not follow [Defendant] Martin's orders and continued assaulting [Plaintiff] and Adkins. Attempting to control the ongoing assault and unlawful resistance, [Defendant] Martin sprayed the "clothing area" of [Defendant] Hayes and Connors with his duty issued OC (Oleoresin Capsicum or cayenne pepper) spray. After OC was deployed, [Defendant] Hayes stopped assaulting [Plaintiff], but inmate Connors continued assaulting Adkins. [Defendant] Martin sprayed OC on the "clothing area" of inmate Connors a second time. While [Defendant] Martin was spraying OC (or immediately thereafter), . . . inmate Connors stopped.

(<u>Id.</u> at 3.) This summary reflects that any incorrect use of the OC spray did not so limit its effectiveness as to prevent it from inducing Defendant Hayes to stop his assault. Finally, the report offers no facts to support the bald conclusion that Defendant Martin used OC spray incorrectly. (<u>See id.</u> at 1-5.) "An expert's affidavit that is wholly conclusory and devoid of reasoning does not comply with Fed. R. Civ. P. 56(e) [now codified at Fed. R. Civ. P. 56(c)]." <u>M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.</u>, 981 F.2d 160, 165 (4th Cir. 1992) (en banc).

In sum, the record supports entry of summary judgment for Defendant Martin.

### III.  CONCLUSION

Even when viewed in the light most favorable to Plaintiff, the evidence he adduced fails as a matter of law to support his claims against the Sheriff Defendants.

**IT IS THEREFORE RECOMMENDED** that the Motion for Summary Judgment on Plaintiff's Claims under Federal Law (Docket Entry 40) and Motion for Summary Judgment on Plaintiff's Claim under State Law (Docket Entry 42) be granted and that judgment be entered against Plaintiff on the First, Second, and Fifth Claims for Relief in his First Amended Complaint (Docket Entry 17, ¶¶ 29-45, 56-62).

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

December 14, 2012